SLT:CAC

# M11-1042

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

     - against -

THE PREMISES KNOWN AND
DESCRIBED AS 57 RAPELYE ST.
BROOKLYN, N.Y.

- - - - - - - - - - - - - - - X

Filed Under Seal

AFFIDAVIT IN SUPPORT
OF SEARCH WARRANT

(T. 18, U.S.C. § 846)

EASTERN DISTRICT OF NEW YORK, SS:

         RICHARD KERSHOW, being duly sworn, deposes and states

that he is a Detective with the New York City Police Department

currently assigned to the Drug Enforcement Administration ("DEA")

Task Force, duly appointed according to law and acting as such:

         Upon information and belief, there is probable cause to

believe that there is currently concealed on the PREMISES KNOWN AND

DESCRIBED AS 57 RAPELYE ST., BROOKLYN, N.Y. (the "SUBJECT

PREMISES"): narcotics, firearms, scales, cutting agents, other drug

paraphernalia, wrapping materials, including plastic bags and

rubber bands, discarded wrappers and other materials used to

conceal and transport narcotics, money counters, machines used to

package narcotics, surveillance equipment, telephones, SIM cards,

SmartMedia flash memory cards, currency, financial records,

including rental agreements, utility bills, telephone bills and gas

bills, car ownership records, safes, drug records and money

laundering records, including ledgers, papers, computer records and

other documents reflecting information such as names, telephone numbers, addresses and financial records of individuals involved in trafficking in narcotics, books and records showing cash transactions and prices and/or quantities of narcotics purchased and payments received, correspondence, facsimiles, memoranda, canceled checks, drafts, wire transfer receipts, money orders, notes and notebooks, all of which constitutes evidence, fruits and instrumentalities of violations of Title 21, United States Code, Section 846, conspiracy to distribute and possess with intent to distribute narcotics.

The source of Your deponent's information and the grounds for his belief are as follows:[1]

1. I, Richard Kershow, am a Detective of the Nassau County Police Department, duly appointed according to law and acting as such. I have been a Nassau County Detective for approximately five years and am currently assigned to the Long Island District Office of the Drug Enforcement Administration Task Force (the "Task Force"), where I am tasked with investigating narcotics trafficking, money laundering and other offenses. I am

---

[1] The facts set forth in this Affidavit are based, in part, on my personal observations and experience, conversations with law enforcement officers and my review of documents and records pertinent to this case. Because the purpose of this Affidavit is to set forth only those facts necessary to establish probable cause to search the Subject Premises, I have not described all of the relevant facts of which I am aware. Conversations described herein are related in sum and substance.

cross-designated as a Special Agent of the Drug Enforcement
Administration ("DEA"). During my tenure with the DEA, I have
participated in numerous narcotics investigations during the course
of which I have conducted physical and wire surveillance,
executions of search warrants, and reviews and analyses of numerous
taped conversations and records of drug traffickers. Through my
training, education and experience -- which has included numerous
instances of debriefing cooperating drug traffickers, monitoring
wiretapped conversations of drug traffickers, conducting searches
of locations where drugs and money have been found, and conducting
surveillance of individuals engaged in drug trafficking -- I have
become familiar with the manner in which illegal drugs are imported
and distributed, the method of payment for such drugs, and the
efforts of persons involved in such activity to avoid detection by
law enforcement.

2.    Among other duties, I have been participating in an
investigation of several large-scale international drug trafficking
organizations based in Montreal, Canada that have formed a
consortium along with a number of marijuana brokers and
distributors in the United States and are actively working together
to define the various territories for drug distribution, set prices
and provide transportation for drug smuggling ventures (the
"Consortium"). One of the principal members within the Consortium
has been identified as Jimmy COURNOYER, also known as "Cosmo." The

-3-

investigation has revealed that in just the past two or three years COURNOYER coordinated the importation and distribution of more than 30,000 kilograms of hydroponic marijuana into the United States, specifically to Brooklyn, New York, from Canada.  COURNOYER also arranged to transport vast quantities of marijuana proceeds from New York to California on behalf of the Consortium.  The marijuana proceeds were then used to purchase cocaine that was exported into Canada for distribution.  This trade-based money laundering scheme resulted in enormous profits.

3.  COURNOYER employed various marijuana distributors in New York, including an individual named JOHN TASCHETTI.  As set forth below, the investigation has revealed that TASCHETTI uses the SUBJECT PREMISES as a stash house.

<u>DESCRIPTION OF THE SUBJECT PREMISES</u>

4.  The SUBJECT PREMISES is a first floor apartment within a red brick and stucco apartment building that is adjacent to other buildings.  The apartment building his two black doors, and the SUBJECT PREMISES is located through the door on the right side of the apartment building marked "57."  That door leads to a vestibule in which there is another door that opens to the right side of the apartment building.  The door to the SUBJECT PREMISES is on the first floor.  A photograph of the SUBJECT PREMISES is attached as Exhibit A.

-4-

## PROBABLE CAUSE TO SEARCH THE SUBJECT PREMISES

5.  During the course of the investigation, DEA Task
Force agents received information about the Consortium from a
confidential informant ("CW1") whose information has proven to be
reliable and has led to multiple arrests and seizures of drugs and
drug proceeds, including the recent seizure of approximately 49
kilograms of cocaine and $900,000. CW1 was charged for his role in
the importation and distribution of marijuana on behalf of the
Consortium, and is cooperating with authorities in the hopes of
obtaining a lesser sentence. In sum and substance, CW1 stated that
COURNOYER headed a Montreal-based drug trafficking organization
that imported vast quantities of marijuana into the New York area
for distribution and then bulk transported the cash proceeds from
marijuana sales to California, where it was used to purchase
kilogram quantities of cocaine to be smuggled into Canada. CW1
specifically informed DEA Task Force agents that COURNOYER had a
garage in New York where the marijuana is transported in trucks
from Montreal, Canada and unloaded. From there, marijuana is sold
in Brooklyn, New York and the surrounding areas. COURNOYER employs
an individual to collect the marijuana proceeds, who in turn
provides the proceeds to a bulk cash transporter selected by CW1
who transports the money to Los Angeles, California for the
purchase of cocaine.

-5-

6.     On or about April 24, 2011, CW1 was contacted by COURNOYER via an encrypted blackberry to arrange a money pickup of approximately $200,000.00 in the New York City area with a 6% commission to be included in the money to be laundered to California.     COURNOYER specifically asked CW1 to bulk ship the money to one of his criminal associates who was managing operations in Los Angeles, California.     JOHN TASCHETTI provided the money to an intermediary working on behalf of CW1, who in turn sent the money to California.     DEA Undercover agents in California ultimately seized 49 kilograms of cocaine from the residence of one of COURNOYER's criminal associate -- the associate who received the money from TASCHETTI in California.

7.     Following the April 24, 2011 transaction involving TASCHETTI, the DEA Task Force was able to use an undercover agent in New York (the "UC") to infiltrate COURNOYER's organization by posing as a bulk cash transporter working for CW1.     CW1 spoke to COURNOYER who supplied the instructions for the UC.     In May 2011, the UC was instructed to transport approximately $150,000.00 in United States currency from New York to California.     The UC was further instructed that he would receive a call from a New York marijuana distributor to arrange for the money drop.     On May 6, 2011, at approximately 1:00 p.m., the UC received a telephone call from TASCHETTI.     TASCHETTI and the UC arranged to meet in Brooklyn, New York to conduct the money exchange.     During this call, the UC

advised TASCHETTI that he/she would call TASCHETTI again to determine the exact location. At approximately 3:50 p.m., the UC arrived at the prearranged meeting location in the vicinity of Atlantic Avenue and Henry Street in Brooklyn, New York. The UC then called TASCHETTI, who stated that he was on the other side of the tunnel and would be at the location shortly. At this time, DEA Task Force agents were conducting surveillance in the vicinity of the SUBJECT PREMISES, which prior surveillance had identified as a narcotics stash house for the New York members of COURNOYER's organization. DEA Task Force agents observed TASCHETTI exit the SUBJECT PREMISES carrying a yellow plastic bag, which he placed into the trunk of a black Infiniti sedan bearing New York registration DXS2234, registered to 137 Prescutt Avenue in Staten Island under a different name, before driving away in the direction of the prearranged meeting spot.

8. A short time later, DEA Task Force agents observed the same black Infiniti sedan arrive at the prearranged meeting location and park just in front of the vehicle being driven by the UC. TASCHETTI exited the Infiniti and proceeded to take a weighted purple plastic bag out of the trunk. TASCHETTI then walked to the front passenger side of UC's vehicle and placed the bag on the front passenger seat of the vehicle. When DEA Task Force agents later opened the purple bag, they discovered a yellow plastic bag

inside that contained approximately $150,000.00 in United States currency.

9.    DEA Task Force agents continued to follow TASCHETTI as he drove away from the meeting spot back to the SUBJECT PREMISES where TASCHETTI parked the black Infiniti directly across the street. DEA Task Force agents subsequently walked the perimeter of the SUBJECT PREMISES and detected a strong odor of marijuana emanating from the premises.

10.    On or about May 19, 2011, CW1 was contacted by COURNOYER, via an encrypted blackberry, to arrange for another money pickup of approximately $300,000. CW1 forwarded the UC's cellular telephone to COURNOYER via an encrypted blackberry. COURNOYER advised CW1 that "his guy" would contact the UC to finalize the plans for the money exchange.

11.    On May 19, 2011, at approximately 2:15 p.m., the UC received another call from TASCHETTI who told the UC that he wanted to meet in the vicinity of Henry Street and Atlantic Avenue in Brooklyn, New York. Following this telephone call, DEA Task Force agents established surveillance across the street from the SUBJECT PREMISES. DEA Task Force agents saw TASCHETTI exit a black Mercedes Benz, registered to 68 Keune Court, Staten Island, which is the address on TASCHETTI's New York State driver's license, and remove a rectangular shaped, green bag from under the floor area of the trunk. TASCHETTI then carried the green bag into the SUBJECT

PREMISES, while an unidentified female conducted counter surveillance. Shortly thereafter, TASCHETTI left the SUBJECT PREMISES carrying the green bag. TASCHETTI then placed the bag into the same black Infiniti vehicle that agents had previously seen TASCHETTI drive and left the area in that vehicle.

12. After driving away from the SUBJECT PREMISES, at approximately 6:35 p.m., TASCHETTI called the UC to find out where the UC was parked. A few minutes later, TASCHETTI pulled up next to the UC's car in the black Infiniti. TASCHETTI exited the Infiniti and removed the same weighted green bag out of the trunk and placed it in the UC's trunk. The green bag contained United States currency in the amount of $226,990.

13. On September 9, 2011, the Honorable Dora L. Irizarry authorized the interception of wire communications occurring to and from TASCHETTI's cellular telephone, and for the disclosure of longitude and latitude data. While monitoring TASCHETTI's telephone, agents also conducted surveillance outside the SUBJECT PREMISES. During the period of interception, agents listened to TASCHETTI actively negotiate on his cellular telephone for the purchase and sale of marijuana to drug customers, and then watched him entering and exiting the SUBJECT PREMISES. For example, on September 20, 2011, TASCHETTI coordinated a marijuana sale to a New Jersey based customer identified as Robert Dalton. During an intercepted call, TASCHETTI and Dalton discussed meeting

in the vicinity of exit #12 in Staten Island.   In a subsequent call, TASCHETTI gave Dalton directions to his "boy's house" on Staten Island where they were planning to divide the marijuana load.   Agents observed TASCHETTI exit the SUBJECT PREMISES carrying two weighted paper shopping bags, which, based on my training, experience and the investigation that has been conducted thus far, I believe contained marijuana.   The agents then saw TASCHETTI enter and drive away in the same white Mercedes Benz that was registered to his home address.   Eventually, agents observed TASCHETTI meet up with Dalton, but were unable to continue further surveillance.

14.   On October 15, 2011, agents observed TASCHETTI bring shopping bags out of the SUBJECT PREMISES.   Based on my training and experience and the investigation that has been conducted thus far, I believe the shopping bag contained marijuana being brought into the SUBJECT PREMISES.   In addition, agents observed others accompanied by TASCHETTI bringing boxes and bags into and out of the SUBJECT PREMISES throughout the past month. Based on my training and experience and the investigation that has been conducted thus far, I believe the boxes and bags contained marijuana and currency.

15.   Based on my training and experience, I know:

(a)   Persons engaged in money laundering and narcotics businesses often communicate by telephone, facsimile, mail, e-mail and other means to facilitate their business.   During

-10-

the course of the investigation, agents have identified numerous prepaid wireless telephones used by members of the organization to conduct their illegal activities.

(b) Persons engaged in money laundering and narcotics businesses often use such financial methods as letters of credit, wire transfers, cash payments, cashiers checks, multiple bank accounts and other methods to conduct their business. These techniques can be used to disguise the origin and movement of activity.

(c) Persons engaged in money laundering and narcotics businesses often keep and maintain documents and other records, including, but are not limited to, bank records, memoranda, notes, correspondence, contracts, books of account, and financial records, investment records, work papers, canceled checks, drafts, money orders, safety deposit boxes, safes, cash and cash equivalents, facsimiles, fax machines, notebooks, and telephone and address records.

(d) Persons engaged in money laundering and narcotics businesses, like legitimate business persons, often maintain and/or create business documents on computer and often use computers to conduct their business, including to maintain records of payment and the transmission of electronic mail messages to criminal associates.

(e)   Persons  engaged  in  money  laundering  and narcotics businesses often keep and maintain computerized documents and  other  records,  including,  but  not  limited  to,  bank  records, memoranda,  notes,  correspondence,  contracts,  books  of  account,  and financial  records,   investment  records,  work  papers,  e-mails, telephone  and  address  records.   In  my  training  and  experience, individuals  engaged  in  money  laundering  frequently  maintain  such records  in  computers,  including  central  processing  units,  external and  internal  drives  and  external  and  internal  storage  equipment  or media,  computer  or  data  processing  software,  hard  disks,  floppy disks,  magnetic  tapes,  integral  RAM  or  ROM  units,  and  any  other permanent  or  transient  storage  device(s);  stored  electrical  mail whether  contained  on  magnetic  tape,  diskettes,  photo-optical devices,  or  any  other  medium.   In  fact,  during  the  course  of  this investigation,  searches  of  several  residences  and  stash  houses  have revealed  that  members  of  the  target  organization  used  such electronic  means  to  communicate  with  co-conspirators,  such  as through  email  or  text  messages,  and  stored  information  related  to their  narcotics  trafficking  activities  on  computers  stored  in  their residences.

(f)   Persons  engaged  in  money  laundering  and narcotics  businesses  maintain  the  aforementioned  items,  records, documents  and  tools  where  they  have  ready  access  to  them, frequently  in  their  residences  and  businesses.

16. In a substantial number of residential searches executed in connection with the narcotics trafficking and money laundering investigations in which I have been involved, including the instant investigation, and in such searches conducted by other experienced law enforcement officers who have conveyed their experiences to me, the items described in paragraphs 21(a)-(f) above have typically been recovered.

CONCLUSION

17. Wherefore, it is respectfully requested that a search warrant be issued authorizing Special Agents from the Drug Enforcement Administration, with proper assistance from other law enforcement officials, to enter the SUBJECT PREMISES to search for and seize the following: narcotics, firearms, scales, cutting agents, other drug paraphernalia, wrapping materials, including plastic bags and rubber bands, discarded wrappers and other materials used to conceal and transport narcotics, money counters, machines used to package narcotics, surveillance equipment, telephones, SIM cards, SmartMedia flash memory cards, currency, financial records, including rental agreements, utility bills, telephone bills and gas bills, car ownership records, safes, drug records and money laundering records, including ledgers, papers, computer records and other documents reflecting information such as names, telephone numbers, addresses and financial records of individuals involved in trafficking in narcotics, books and records

showing cash transactions and prices and/or quantities of narcotics purchased and payments received, correspondence, facsimiles, memoranda, canceled checks, drafts, wire transfer receipts, money orders, notes and notebooks, all of which constitutes evidence, fruits and instrumentalities of violations of Title 21, United States Code, Section 846, conspiracy to manufacture, distribute and possess with intent to distribute narcotics.

18. Because of the nature of this application, it is hereby further respectfully requested that this application be sealed.

RICHARD KERSHOW
Task Force Officer
Drug Enforcement Administration

Sworn to before me this
21st day of October, 2011

UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

-14-

# ATTACHMENT A

Case 1:11-mj-01042-JMA   Document 1   Filed 10/21/11   Page 16 of 16 PageID #: 16

# Google

**Address 64 Rapelye Street**

Address is approximate





© 2011 Google